UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                      :

BARBARA FINCH, Individually and on  :
behalf of Manny Moe,
                      :

            Plaintiffs,       :

          - against -      :

                      :

THE CITY OF NEW YORK;      :
Administration for Children's Services;  :
New Alternatives for Children, Inc.:  :
Talbot Perkins Agency; Donnett Huggins,:
individually, under color of state law,  :
and in her official capacity as an  :
employee Case Planning Specialist,  :
Administration for Children's Services;  :
Nancy Ruiz, individually, under color of  :
state law, and in her official capacity  :
as an employee, Child Evaluation  :
Specialist, Administration for Children's  :
Services; Francis Okeke, individually,  :
under color of state law, and in his  :
official capacity as an employee,  :
Supervisor of Case Planning Specialists,  :
Administration for Children's Services;  :
Gibre Abraha, individually, under color  :
of state law, and in his official capacity  :
as an employee, Case Manager,  :
Administration for Children's Services;  :
Kelly Ellingham individually, under  :
color of state law, and in her official  :
capacity as an employee, Case Planner,  :
Talbot Perkins Agency; Ellen Quan,  :
individually, under color of state law,  :

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/19/06

OPINION AND ORDER

04 Civ. 4434 (SAS)

1

and in her official capacity as an :
employee, Case Planner, Talbot Perkins :
Agency; Maritza Shapiro individually, :
under color of state law, and in her :
official capacity as an employee, :
**Supervisor of Case Planners, Talbot** :
**Perkins Agency; Alicia O'Hare,** :
individually, under color of state law, :
and in her official capacity as an :
employee, Case Worker Supervisor, :
**New Alternatives for Children;** :
Mary Moe, individually, under color of :
state law, and in her official capacity as :
an employee, Supervisor of Foster Care, :
**New Alternatives for Children,** :

:
              **Defendants.** :
------------------------------------------------------ X

## SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

          Plaintiff Barbara Finch brings this suit under section 1983 of Title 42

of the United States Code, claiming damages for due process violations committed

by the defendants in not placing her grandchild, Manny Moe, into her custody and

restricting her visitation rights to Manny. Talbot Perkins Children's Services

("Talbot Perkins") and its employees move for summary judgment on all of the

claims pending against them. For the reasons given below, that motion is granted

as to all claims arising from restricted visitation and for all claims against Talbot

2

Perkins' employees in their individual capacities. The motion is denied as to all claims for denial of custody against the Talbot Perkins Agency and its employees in their official capacities.

## II.    BACKGROUND

### A.    Procedural History

Finch originally filed suit on April 25, 2004 against Talbot Perkins as well as the City of New York, the Administration for Children's Services ("ACS"), and New Alternatives for Children, Inc., the foster agency that took control of Manny's foster family placement after Talbot Perkins closed.[1]  Finch also named as defendants numerous employees of each defendant agency in both their individual and official capacities.[2]  The City defendants and the New Alternatives for Children defendants settled their claims with Finch.[3]  In addition, Finch brought a separate claim against the New York State Office of Children and Family Services, ACS, and the individual directors of the New York State Central Registry, claiming that delays in scheduling a hearing to challenge her indicated

---

[1]    *See* Complaint ("Compl.") ¶¶ 4-16.

[2]    *See id.*

[3]    *See* Talbot Perkins Agency's and Its Employees' Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1 Stmt.") ¶ 2.

3

report status violated her Due Process rights. This Court held, inter alia, that any right to a prompt administrative hearing was not clearly established, entitling the individual defendants to qualified immunity.[4]

## B.    Statutory Framework

In New York State, the Office of Children and Family Services ("OCFS") supervises the provision of child protective services by local services districts, which are each required to establish child protective services to investigate allegations of child abuse or maltreatment and to provide services to children in need of protection. [5]  In New York City, the local child protective services agency is ACS.[6]

OCFS maintains a State Central Register ("SCR") of reports of child abuse and maltreatment.[7]  SCR receives telephone calls reporting suspected child abuse or maltreatment, and when such a report involves a child in New York City,

---

[4]    *See Finch v. New York State Office of Children and Family Servs.*, 499 F. Supp. 2d 521, 538 (S.D.N.Y. 2007).

[5]    *See* Declaration of Roberta Frederick, employee of the Statewide Central Register ("Frederick Decl."), Ex. G to Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem.") ¶¶ 7-8.

[6]    *See id.* ¶ 8.

[7]    *See* N.Y. Soc. Serv. Law § 422.

4

SCR immediately transfers the allegations to ACS for investigation.[8] If the ACS investigation uncovers some credible evidence of child abuse or maltreatment, it classifies the report as "indicated."[9] If there is no credible evidence of abuse or maltreatment, ACS classifies the report as "unfounded" and seals the report.[10] ACS notifies SCR about the results of all investigations, and, if a report is indicated, ACS notifies the subject of that report that his or her report is indicated, and that he or she has the right to request an administrative hearing to challenge that determination.[11]

A subject of an indicated report has two opportunities to challenge the determination and amend the report from "indicated" to "unfounded": *first*, within ninety days of receiving notice that the report is indicated, and *second*, prior to disclosure of the existence of the indicated report in response to a request by a licensing or provider agency.[12] If a subject brings a challenge within ninety

[8] *See* Frederick Decl. ¶ 9.

[9] *See id.* ¶¶ 10-11.

[10] *See id.* ¶¶ 12, 15.

[11] *See id.* ¶ 16.

[12] *See id.* ¶ 22. Provider and licensing agencies are agencies that employ, license, or otherwise authorize adults to be involved with children. Under section 424-a of the Social Services Law, these agencies are required to request a search of the SCR database before

5

days of being notified, as Barbara Finch did in this case, ACS sends all records,

reports, and other information on the subject to SCR, which then reviews the

material and, after affording ACS a reasonable opportunity to present its views,

determines whether or not there is a fair preponderance of evidence to find that the

subject committed the acts of abuse or maltreatment.[13] If SCR determines that

there is not a fair preponderance of evidence, it amends the report to unfounded

and notifies the subject and local child protective services of the decision.[14] If, on

the other hand, SCR determines that there is a fair preponderance of evidence of

acts of child abuse or maltreatment, it then determines whether such acts could be

reasonably related to the subject's employment or licensing in the child care

field.[15] SCR then notifies the subject of the report of its decision, and refers the

matter for an administrative hearing to review whether or not there was a fair

preponderance of evidence that the subject committed acts of child abuse or

---

employing, certifying, or licensing persons applying for certification,
employment, or licensure in the child care field. *See id.* ¶¶ 18-20.
Disclosure to these agencies is done to avoid putting known subjects
of an indicated report in positions where they would be in contact
with children.

[13]    *See id.* ¶¶ 26-27.

[14]    *See id.* ¶ 28.

[15]    *See id.* ¶ 29.

6

neglect.[16]  At such a hearing, an administrative law judge determines whether the allegations of child abuse are supported by a fair preponderance of the evidence.[17] If the administrative law judge finds that the evidence does not support the allegations, SCR amends the report to "unfounded" and seals the record; if the administrative law judge finds that the evidence supports the allegations, SCR amends the report to note that the "indicated" designation is retained following an administrative hearing.[18]

If the subject of the report has not yet received a hearing at which an administrative law judge determines whether a fair preponderance of the evidence supports the allegations, SCR cannot respond to any database check of the subject by an inquiring agency, and instead must notify the subject of his or her right to an administrative hearing before SCR notifies the inquiring agency of the indicated report.[19]  This practice is the result of holdings by the Second Circuit and the New York State Court of Appeals that SCR's past practice of notifying an inquiring agency of the existence of an indicated report before the subject has had an

---

[16]     *See id.* ¶ 30.

[17]     *See id.* ¶¶ 43-44.

[18]     *See id.*

[19]     *See id.* ¶ 39.

7

administrative hearing violated the subject's Due Process rights.[20]

## C. Facts

In early 2001, Barbara Finch was the foster mother of five children,

including Kaylee Lanane-Finch, whose birth mother was Barbara Finch's

daughter, Phatimah Finch.[21] On April 4, 2001, a report of child maltreatment was

filed against Finch after she left one of her foster children unattended at her school

bus stop and the child wandered off and got lost.[22] On June 3, 2001, ACS found

that this report was "indicated."[23] On July 15, 2001, Barbara Finch requested that

---

[20] *See Valmonte v. Bane*, 18 F.3d 992, 1004 (2d Cir. 1994) ("We hold
that the high risk of error produced by the procedural protections
established by New York is unacceptable."); *Matter of Lee TT v.
Dowling*, 87 N.Y.2d 699, 712 (1996) ("We conclude that the Due
Process Clause of the Federal Constitution requires the Department to
substantiate reports of child abuse by a fair preponderance of the
evidence before they may be disseminated to providers and licensing
agencies as a screening device for future employment.").

[21] *See* Court Ordered Investigation of September 6, 2001 ("COI"), Ex. B
to Reply Memorandum to Plaintiff's Opposition to Talbot Perkins'
Motion for Summary Judgment at 1.

[22] *See* 8/7/03 Decision of Administrative Law Judge Udochi, Ex. D to
Certification of Plaintiff's counsel Thomas Hoffman ("Hoffman
Cert.") at 2.

[23] *Id.* at 2-3.

the report be amended to unfounded.[24]  On February 6, 2003, the SCR denied

Finch's request that the report be amended to unfounded, and referred the case to

an administrative hearing.[25]  The administrative law judge determined, in an

opinion issued on August 7, 2003, that the allegation of inadequate guardianship

was not supported by a fair preponderance of the evidence, and amended the

report to unfounded.[26]

      Meanwhile, Manny Moe, Barbara Finch's grandson, was born on

June 11, 2001 to Phatimah Finch.[27]  Because Manny was born with syphilis and

addicted to cocaine, and because Phatimah was mentally ill, ACS filed a petition

for termination of Phatimah's parental rights.[28]  ACS obtained custody of Manny

on June 19, 2001.[29]  On June 28, 2001, ACS transferred custody of Manny to

---

[24]    *See Finch v. New York State Office of Children and Family Servs.*,
499 F. Supp. 2d 521, 529 (S.D.N.Y. 2007).

[25]    *See id.*

[26]    *See id.*

[27]    *See* Def. 56.1 Stmt. ¶¶ 8-9.

[28]    *See id.* ¶ 9.

[29]    *See* Petition of Barbara Finch for Custody of Manny Moe, Ex. D to
Def. Mem. at 2.

Talbot Perkins.[30]  Though Barbara Finch indicated to Talbot Perkins that she was

willing to take custody of Manny,[31] and Phatimah suggested in an interview with

ACS that she wanted Barbara Finch to take custody of Manny,[32] Manny was

placed in a non-kinship foster home shortly after Talbot Perkins took custody from

ACS.[33]  While the record is unclear as to whether ACS or Talbot Perkins had

ultimate control over this placement decision, an ACS caseworker informed

Phatimah on June 28 that Manny was not placed with his grandmother because

"[ACS] believed that the [grandmother] might be overwhelmed."[34]  Further, a

report from a joint conference between ACS and Talbot Perkins held on July 3,

2001, establishes that "Manny was not placed . . . in the home of the maternal

grandmother as the grandmother has an indicated case against her."[35]  Barbara

---

[30]     *See* Def. 56.1 Stmt. ¶ 3. Both parties agree that for purposes of this
         action, Talbot Perkins and its individual employees are state actors.
         *See id.* ¶ 5.

[31]     *See* Declaration of Barbara Finch ("Finch Decl.") ¶ 5.

[32]     *See* COI at 3.  Barbara Finch also claims that Phatimah offered to
         voluntarily surrender her parental rights to Manny on the condition
         that Barbara Finch take custody of him.  *See* Compl. ¶ 31.

[33]     *See* Notes from Office of Children and Family Services Case File
         ("Case File"), Ex. A to Hoffman Cert. at 10.

[34]     *Id.* at 1.

[35]     *Id.* at 8.

Finch alleges that an additional basis of the decision to place Manny in a non-kinship foster home and away from his grandmother and sister was ACS's apparently mistaken belief that Manny's sister Kaylee was herself living in a non-kinship foster home.[36] After Manny's placement in the non-kinship foster home, Talbot Perkins allowed Barbara Finch and Kaylee Finch to visit with him every other week in a supervised area in Talbot Perkins' offices.[37] Finch claims that Talbot Perkins denied her requests for more frequent and unsupervised visits.[38] Neither party disputes that Barbara Finch did not apply for visitation rights under section 72 of the New York State Domestic Relations law, which allows grandparents to petition the court for visitation rights when the birth parents are

---

[36] *See* Memorandum of Law in Opposition to Talbot Perkins' Motion for Summary Judgment ("Pl. Mem.") at 4. Some of ACS's information on file does appear to contradict Barbara Finch's claim that she was Kaylee's foster parent. *Compare* Case File at 6 ("[Kaylee] . . . is freed and resides in a non-kinship foster home") *with* Finch Decl. ¶¶ 4-5 ("On June 11, 2001, I had custody of Kaylee as a licensed kinship foster mother . . . ."). However, other parts of the ACS file recognize that Kaylee resided with her grandmother at the time of Manny's placement. *See* Case File at 9 ("Manny was not placed with her [sic] sibling Kaylee in the home of the maternal grandmother . . . .").

[37] *See* Finch Decl. ¶8; Uniform Case Records ("UCR"), Ex. B to Hoffman Cert. at 4.

[38] *See* Finch Decl. ¶ 9.

11

deceased or otherwise unable to care for the child.[39]

On July 25, 2001, Barbara Finch petitioned the New York Family Court for custody of Manny.[40] At a September 6, 2001, hearing Judge Sara P. Schechter of the Family Court decided against placing Manny with Barbara Finch,[41] stating at the hearing that she felt Finch was "overwhelmed" by her current responsibilities to her five foster children.[42] Judge Schechter based this determination on a Court Ordered Investigation prepared by ACS that recommended that Barbara Finch not take custody of Manny "because she has a recent indicated SCR case . . . . ACS believes that she is already overwhelmed by her current situation and will be further overwhelmed by adding another child to the home."[43] The Court Ordered Investigation form also had a heading labeled "Results of inquiry to state central registry," under which the ACS caseworker wrote: "The petitioner has an SCR report dated April 4, 2001 . . . . The report is

---

[39]    *See* Def. Mem. at 14-15; Pl. Mem. at 18.

[40]    *See* Def. 56.1 Stmt. ¶ 11.

[41]    *See* Order of Disposition and Permanency Plan, Ex. E to Def. Mem. at 2.

[42]    Transcript of Permanency Hearing, Ex. F to Def. Mem. at 3.

[43]    COI, at 4.

indicated for inadequate guardianship . . . ."[44]

      After the Family Court denied Barbara Finch's custody application, Manny remained in the non-kinship foster home under the supervision of Talbot Perkins.[45] According to Talbot Perkins' records, the agency remained opposed to allowing Barbara Finch to take custody of Manny as a foster mother because Finch had "an indicated case with ACS for 'inadequate guardianship,' which makes the agency concerned about supporting the discharge of [foster child] Manny to [Finch]."[46] Manny remained in the non-kinship foster home supervised by Talbot Perkins throughout 2001 and early 2002.[47] During this time, Manny required special care for developmental delays in his hearing and vision.[48] In February 2002, Talbot Perkins closed, and New Alternatives for Children foster care agency assumed responsibility of his case.[49] In April 2003, Judge Schechter terminated

---

[44]    *Id.* at 2.

[45]    *See* Def. 56.1 Stmt. ¶ 13.

[46]    UCR at 13.

[47]    *See* Def. 56.1 Stmt. ¶¶ 13-15.

[48]    *See* UCR at 4.

[49]    *See* Def. 56.1 Stmt. ¶ 15.

Phatimah Finch's parental rights to Manny.[50]  Barbara Finch obtained custody of

Manny in May 2003 – before the administrative hearing amending her indicated

report to unfounded – based on New Alternatives for Children's determination that

Barbara Finch's indicated report was not reasonably related to her having regular

and substantial contact with Manny.[51]

## III.  LEGAL STANDARD

### A.  Summary Judgment[52]

Summary judgment is appropriate "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of

law."[53]  An issue of fact is genuine "'if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.'"[54]  A fact is material when it

---

[50]     *See* Child Psychosocial Study, Ex. C to Reply Mem. at 2.

[51]     *See* Compl. ¶ 44.

[52]     Although the defendants' motion is entitled "Motion to Dismiss
Plaintiff's First Amended Complaint and/or for Summary Judgment,"
defendants filed the motion after answering the complaint and
obtaining evidence in discovery, and the court will thus treat
defendants' motion as one for summary judgment.

[53]     Fed. R. Civ. P. 56(c).

[54]     *Williams v. Utica Coll. Of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir.
2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626

14

"'might affect the outcome of the suit under the governing law.'"[55] "It is the movant's burden to show that no genuine factual dispute exists."[56]

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. This requires more than a showing of "'some metaphysical doubt as to the material facts,'"[57] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[58] "'All that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[59]

In determining whether a genuine issue of material fact exists, the

(2d Cir. 1998)).

[55]   *Bouboulis v. Transp. Workers Union of America*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[56]   *Vermont Teddy Bear Co. V. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[57]   *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[58]   *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[59]   *McClellan*, 439 F.3d at 144 (alteration in original) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[60] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[61] Summary judgment is inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."[62]

## IV. APPLICABLE LAW

### A. Procedural Due Process

Courts "'examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'"[63] The court determines

---

[60] *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

[61] *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

[62] *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

[63] *Valmonte*, 18 F.3d at 998 (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

16

what process is due by considering three factors: *first*, the private liberty or property interest that will be affected by the official action, *second*, the risk of erroneous deprivation of that interest through the procedures used, and the value of any alternative or substitute procedural safeguards, and *third*, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[64]

## 1. Finch's Liberty Interest

Finch's first claim relates to her claimed liberty interest in taking custody of her biological grandchild. The Second Circuit has held that while non-kinship foster parents do not have a constitutional right to maintain custody of foster children, certain biologically-related foster parents may have a constitutionally protected interest in preserving that biological family unit, based on three factors: *first*, the biological relationship between the foster parent and foster child, *second*, the existence of a family unit that lived together before the foster parent entered into the foster parent contract with the state, and *third*, minimal conflict between the wishes of the biologically-related foster parent and

---

[64]    *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

17

the birth parents.[65] However, at least one federal circuit has distinguished between

the constitutionally protected right of an established family unit to be free from

government interference and the constitutionally unprotected right of biological

grandparents to take custody of a child when the grandparents and grandchild have

no preexisting familial bond.[66]

There is little case law concerning grandparents' visitation rights.

While New York State does provide a judicial avenue for grandparents to apply

for visitation rights when both biological parents are deceased or otherwise unable

to provide care for their child,[67] Finch points to no federal case law supporting a

---

[65] *See Rivera v. Marcus*, 696 F.2d 1016, 1024-25 (2d Cir. 1982) (citing *Smith v. Org. of the Foster Families for Equality and Reform*, 431 U.S. 816, 845-46 (1977)) ("In these circumstances, we find that Mrs. Rivera possesses an important liberty interest in preserving the integrity and stability of her family."). *See also Rodriguez v. McLoughlin*, 214 F.3d 328, 337 (2d Cir. 2000).

[66] *See Mullins v. State of Or.*, 57 F.3d 789, 794 (9th Cir. 1995) ("A negative right to be free of governmental interference in an already existing familial relationship does not translate into an affirmative right to create an entirely new family unit out of whole cloth." (citing *Lipscomb v. Simmons*, 962 F.2d 1374, 1378-79 (9th Cir. 1992))).

[67] *See* N.Y. Dom. Rel. Law § 72. Grandparents apply to their local supreme court for a special proceeding or a writ of habeas corpus to bring the child before the court. The court then gives notice of the proceeding to any parent or anyone with legal custody or control over the child. The court may then grant grandparents visitation rights upon a finding that such visitation is in the best interest of the child.

18

constitutional right to visitation by grandparents, nor did this Court discover any

such federal case law.

## 2. State Procedures

Both the New York State Court of Appeals and the Second Circuit

have held that due process requires that SCR not inform inquiring child care or

licensing agencies about the existence of an indicated report before the subject of

that report receives an administrative hearing.[68] The *Valmonte* court found that

there was an unacceptably high risk of erroneous deprivation when employers

made screening decisions based on indicated reports, because the "some credible

evidence" standard of proof required to classify a report as indicated was too easy

a threshold to meet, especially in the context of child abuse.[69] SCR still requires

---

*See id.*

[68]     *See Valmonte*, 18 F.3d at 994 ([T]he dissemination of information
from the [State] Central Register to potential child care employers,
coupled with the defamatory nature of inclusion on the list, does
implicate a liberty interest. . . . [T]he procedures established [that
release such information before an administrative hearing] violate due
process . . . ."); *Matter of Lee TT.*, 87 N.Y.2d at 712 ("[T]he Due
Process Clause of the Federal Constitution requires the [SCR] to
substantiate reports of child abuse by a fair preponderance of the
evidence before they may be disseminated to providers and licensing
agencies as a screening device for future employment.").

[69]     *See Valmonte*, 18 F.3d at 1004.

19

only "some credible evidence" to make the initial determination that a report is indicated,[70] though after the *Valmonte* and *Lee TT* decisions, it does not respond to any inquiries about a subject's indicated report status before the administrative hearing.[71] The law is less clear as to what extent a child care agency can use its knowledge of a pre-hearing indicated report as a basis for making child custody decisions. Barbara Finch cites to no case law that prohibits acting on such knowledge of an indicated report, and instead seeks to import such a prohibition from the *Valmonte* and *Lee TT* decisions.[72]

## B. Qualified Immunity

The doctrine of qualified immunity protects government officials from civil liability if the officials' conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[73] Qualified immunity balances "'the need . . . to hold responsible public

---

[70]  *See* Frederick Decl. ¶ 11.

[71]  *See id.* ¶ 39.

[72]  *See* Pl. Mem. at 11-12 (citing *Williams v. Goord*, 142 F. Supp. 2d 416, 428 (S.D.N.Y. 2001) (noting that fact issues need not be identical to infer the unlawfulness of an act if unlawfulness is apparent from or clearly foreshadowed by pre-existing law)).

[73]  *Velez v. Levy*, 401 F.3d 75, 100 (2d Cir. 2005) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

20

officials exercising their power in a wholly unjustified manner and . . . [the need]
to shield officials responsibly attempting to perform their public duties in good
faith from having to explain their actions to the satisfaction of a jury.'"[74]
Qualified immunity "provides ample protection to all but the plainly incompetent
or those who knowingly violate the law."[75] Qualified immunity is "a defense
afforded only to individuals – not municipalities or municipal agencies."[76] "[A]n
official sued in his official capacity may not take advantage of a qualified
immunity defense."[77]

      There are three steps in a qualified immunity analysis. The court first
must determine whether, "taken in the light most favorable to the party asserting
the injury . . . the officer's conduct violated a constitutional right[.]"[78] If there is
no constitutional violation, the defendant is not liable and the court need not

---

[74]    *Locurto v. Safir*, 264 F.3d 154, 162-63 (2d Cir. 2001) (quoting
     *Kaminsky v. Rosenblum*, 929 F.2d 922, 924-25 (2d Cir. 1991)).

[75]    *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[76]    *Williams v. City of Mount Vernon*, 428 F. Supp. 2d 146, 153 n.2
     (S.D.N.Y. 2006).

[77]    *Mitchell v. Forsyth*, 472 U.S. 511, 556 n.10 (1985) (Brennan, J.,
     concurring in part and dissenting in part) (citing *Brandon v. Holt*, 469
     U.S. 464, 472-73 (1985)).

[78]    *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

21

proceed further. If, however, the plaintiff proves a constitutional violation, the court moves to the second step, which asks whether or not, at the time of the violation, the law prohibiting the defendant's conduct was clearly established.[79] If the violated right was not clearly established, the officer is immunized from liability. "Clearly established" means: "(1) the law is defined with reasonable clarity, (2) the Supreme Court or Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'"[80] If the law prohibiting defendant's conduct was clearly established, the court moves to the final step in the analysis, which asks whether or not "'it was objectively reasonable for [the defendant] to believe that his actions were lawful at the time of the challenged act.'"[81] An official's conduct is objectively unreasonable, and not eligible for qualified immunity, "when no officer of reasonable competence could have made the same choice in similar circumstances."[82]

---

[79]    *See id.*

[80]    *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (alterations in original) (quoting *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)).

[81]    *Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003) (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995)).

[82]    *Id.* at 138 (quotation marks omitted).

## C.  Judicial Immunity

"The doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability. Accordingly, the touchstone for the doctrine's applicability has been performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.  When judicial immunity is extended to officials other than judges, it is because their judgments are functionally comparable to those of judges – that is, because they, too, exercise a discretionary judgment as part of their function."[83]  The New York State Court of Appeals has shown a willingness to extend judicial immunity to "'other neutrally positioned government officials, regardless of title, who are delegated judicial or quasi-judicial functions.'"[84]

## D.  Collateral Estoppel

Collateral estoppel, or issue preclusion, precludes re-litigation of an issue where "'(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party

---

[83]   *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435-36 (1993) (footnote, citations, and quotation marks omitted).

[84]   *Mosher-Simons v. County of Allegany*, 99 N.Y.2d 214, 220 (2002) (quoting *Tarter v. State*, 68 N.Y.2d 511, 518 (1986)).

23

had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'"[85] "The burden of showing that an issue raised in a subsequent proceeding 'is identical to one that was raised and necessarily decided in the prior action rests squarely on the party moving for preclusion.'"[86]

## V. DISCUSSION

### A. Constitutional Violations by Individual Employees of Talbot Perkins

Barbara Finch makes three due process claims against Talbot Perkins and several of its employees: *first*, that Talbot Perkins did not place Manny Moe with his biological relatives, *second*, that Talbot Perkins limited Barbara Finch's visitation rights, and *third*, that Talbot Perkins unlawfully acted on its knowledge of Finch's pre-hearing indicated report in denying her custody of Manny as a foster child.

#### 1. Barbara Finch's Liberty Interests

The facts here closely align with the three factors laid out by the

---

[85]     *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 146 (2d Cir. 2005) (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).

[86]     *Cobb v. Pozzi*, 363 F.3d 89, 113 (2d Cir. 2004) (quoting *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000)).

Second Circuit in 1982 in *Rivera v. Marcus*. It is undisputed that Barbara Finch, as Manny's maternal grandmother, is biologically related to him. Secondly, taking as true Finch's claim that Phatimah Finch offered to surrender her parental rights if Barbara Finch could take custody of him, it appears that there is no conflict between Barbara Finch's interest as a foster parent and the wishes of Manny's biological mother. Even without this fact, Phatimah Finch's statement to ACS that she wanted Barbara Finch to have custody of Manny is enough to suggest that there would be minimal tension between Barbara Finch's interests as a foster parent and Phatimah Finch's interests as the birth mother. Lastly, while Barbara Finch and Manny did not reside together before Finch applied to be Manny's foster parent, Barbara Finch and Kaylee were the only stable biological family unit available to Manny, and Barbara Finch's biweekly visits with Manny may have created a strong familial bond between Manny, Kaylee, and Barbara Finch. A jury could reasonably find that Barbara Finch had a constitutionally protected liberty interest in maintaining the integrity and stability of that family unit. This Court thus cannot find as a matter of law that Barbara Finch had no liberty interest in taking custody of Manny.

As for visitation rights, the lack of federal case law identifying or defining a grandparent's constitutional right to visit her grandchildren suggests

that Talbot Perkins did not deny Barbara Finch any constitutionally protected liberty interest, and the portion of Talbot Perkins' motion for summary judgment concerning Finch's claimed damages for restricted visitation rights is granted.

### 2. Procedural Safeguards

To the extent that Finch did have a liberty interest in taking custody of her grandchild, this Court cannot find as a matter of law that the procedural safeguards used by Talbot Perkins to protect that liberty interest met the standards of due process. While the record does not reveal how Talbot Perkins discovered the indicated report on Barbara Finch, it does clearly show that Talbot Perkins, along with ACS, relied on the indicated report in making the decision not to place Manny with Barbara Finch.

I turn now to the factors laid out by the Supreme Court in *Mathews v. Eldridge* that guide a court's determination of whether a party has been accorded due process. *First*, Barbara Finch's interest in taking custody of her grandchild is high, especially as such custody is a protected liberty interest. *Second*, "the state has a strong interest in protecting [children] from the infliction of physical harm by those charged with their care."[87] In *Valmonte v. Bane*, the court was faced with

---

[87]     *Valmonte*, 18 F.3d at 1003 (citing *Santosky v. Kramer*, 455 U.S. 745, 766 (1982)).

similarly compelling interests of both the government and the plaintiff. It held that the third factor – the high risk of erroneous deprivation through the use of indicated reports – broke the tie in favor of the plaintiff.[88] While the record does not establish if indicated reports in 2001 were any more reliable then they were in 1994, when the Second Circuit decided *Valmonte*, a reasonable jury could find that the high risk of erroneous deprivation still exists. Accordingly, Talbot Perkins' motion to dismiss Barbara Finch's claim for failure to state a constitutional violation is denied.

## 3. Qualified Immunity

To the extent that any employees of Talbot Perkins violated Barbara Finch's Due Process rights in their individual capacities, these employees are shielded by qualified immunity for two reasons. *First*, the right to such custody was not clearly established. *Second*, the employees were objectively reasonable in using their knowledge of the indicated report to deny Barbara Finch's request to have custody of Manny.

### a. Any Restriction on Using Indicated Reports Was Not Clearly Established

In 2001, there was no clearly established law that the use of an

---

[88]     *See id.* at 1004.

indicated report by a foster child placement agency violated due process. While *Valmonte* and *Lee TT* expressed strong concerns about the reliability of indicated reports, those decisions focused on the dissemination of indicated reports by the SCR to potential employers or license-granting institutions. Talbot Perkins, as a foster care placement agency, was not in a position to disseminate the existence of indicated reports to anyone, and only used its knowledge of an indicated report as a basis for determining the best placement for Manny. The rulings in *Valmonte* and *Lee TT* did not discuss foster agencies or their child placement decisions, nor did any court do so prior to June 2001. Talbot Perkins thus could not have been on notice that it should cease using indicated reports as a basis for making child placement decisions. While Talbot Perkins should have known that indicated reports were unreliable or produced many false positives, the law in 2001 was not clearly established that using knowledge of such reports violated due process.

### b. **Talbot Perkins' Employees Acted Objectively Reasonably**

It was reasonable for Talbot Perkins' employees to think that Barbara Finch could not adequately care for Manny. After September 6, 2001, the employees of Talbot Perkins were acting in accordance with the Family Court's

28

conclusion that Barbara Finch was "unsuitable" to care for Manny.[89] It is objectively reasonable to follow the holding of a Family Court judge when making decisions about child placement. With respect to placement decisions made before the Family Court ruling, the employees of Talbot Perkins were faced with a limited amount of facts about Manny and his family when making decisions about his placement. Among these limited facts were that Manny's mother was unable to care for him, that his maternal grandmother had an indicated report of child abuse against her and was possibly overwhelmed by her other foster children, and the apparently mistaken fact that Kaylee lived apart from Barbara Finch. Talbot Perkins' employees, tasked with quickly finding the best placement for Manny, did not have the time or the resources to spend investigating Manny's family to verify and supplement the facts before them. Finally, the actions of the Talbot Perkins employees were objectively reasonable because they followed applicable state law. While Barbara Finch points out that New York law presumes that placement with a sibling is in a child's best interest, that presumption can be rebutted if such placement would be contrary to the child's health, safety, or welfare.[90] Talbot Perkins' employees, acting on their knowledge of Barbara

---

[89]     Order of Disposition and Permanency Plan, Ex. E to Def. Mem. at 2.

[90]     *See* N.Y. Fam. Ct. Act § 1027-a.

29

Finch's indicated report and reports from ACS of being "overwhelmed," and their

knowledge that Manny was developmentally delayed and needed special care,

could reasonably conclude that placing Manny with his sister in Barbara Finch's

home would be detrimental to his safety or welfare. Talbot Perkins' motion for

summary judgment is thus granted as to Barbara Finch's claims against the Talbot

Perkins employees in their individual capacities.

## B. Constitutional Violations by Talbot Perkins Agency and Its Employees Acting in Their Official Capacity

This action includes claims against the Talbot Perkins Children's

Services agency, as well as Ellen Quan, Maritza Shapiro, and Kelly Ellingham, in

their official capacities as employees of Talbot Perkins.[91] Talbot Perkins makes no

arguments in any of its moving papers to establish that the agency itself, or its

employees acting in their official capacity, should be protected by qualified

immunity, and instead simply argues that the agency and its employees are all

entitled to qualified immunity.[92] However, qualified immunity is a defense

reserved for individuals. While Talbot Perkins may or may not be a municipal

agency for the purposes of this action, neither party submitted any arguments

---

[91]     *See* Compl. ¶¶ 12-14.

[92]     *See* Def. Mem. at 3.

30

about its liability as a municipal agency or the liability of its employees in their official capacity. Talbot Perkins also claims immunity under the New York State law that immunizes "any person, official, or institution" from civil or criminal liability arising from a good faith effort to enforce state child abuse laws.[93] However, the Supreme Court has rejected state immunity defenses to section 1983 claims, holding that "[a] construction of [section 1983] which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise."[94] Accordingly, Talbot Perkins Children's Services and its employees in their official capacities are not protected by qualified or absolute immunity.

## C.   Judicial Immunity

Leaving aside the question of whether or not Talbot Perkins undertook quasi-judicial functions in following the Family Court's September 6, 2001 finding, the judicial immunity defense does not suffice to immunize the agency from the entirety of Barbara Finch's claim. Talbot Perkins made the initial decision to place Manny in a non-kinship foster home in late June 2001. This

---

[93]   N.Y. Soc. Serv. § 419.

[94]   *Martinez v. State of Cal.*, 444 U.S. 277, 284 n.8 (1980) (quotation marks and citation omitted).

decision did not enact or follow a ruling from the Family Court because there was

no Family Court proceeding about Barbara Finch's qualifications as a foster

mother until several months after the placement decision. That initial placement

decision is one of the bases of Barbara Finch's constitutional complaint, and

Talbot Perkins is not shielded from liability by judicial immunity for that decision.

## D.    Collateral Estoppel

Talbot Perkins argues that Barbara Finch is collaterally estopped from

arguing that Talbot Perkins violated any of her constitutional rights because of this

Court's recent decision in *Finch v. New York Office of Children and Family

Servs.*[95] This argument is unavailing. That case involved possible due process

violations caused by undue delay between the filing of an indicated report and the

administrative hearing.[96] This case involves an entirely different issue: whether

or not a foster agency, as a state actor, may use its knowledge that a potential

foster parent has an indicated report when making a placement decision. Barbara

Finch did not have an opportunity to fully and fairly litigate this issue because it

---

[95]    499 F. Supp. 2d 521.

[96]    *See id.* at 533 ("Plaintiffs argue that the *delay in scheduling of
        administrative hearings* . . . represents an unconstitutional deprivation
        of the fundamental liberty interest to pursue one's employment of
        choice and the licensure necessary to raise a biologically related
        child.") (emphasis added).

32

was not the subject matter of the prior action. Accordingly, Barbara Finch is not collaterally estopped from bringing this action.

## VI. CONCLUSION

For the foregoing reasons, defendants' motion is granted in part and denied in part. A conference is scheduled for June 26, at 5:00 p.m. in Courtroom 15C.

SO ORDERED.

Shira A. Scheindlin
U.S.D.J.

**Dated:**     New York, New York
             June 18, 2008

## -Appearances-

## Counsel for Plaintiffs:

Thomas Hoffman, Esq.
Law Offices of Thomas Hoffman, P.C.
250 West 57th Street, Suite 1020
New York, NY 10107
(212) 581-1180

## Counsel for Defendants:

Albert E. Risebrow, Esq.
Fumuso, Kelly, DeVerna, Snyder, Swart & Farrell, LLP
110 Marcus Boulevard
Hauppauge, NY 11788
(631) 232-0200